STEPHEN A. MILLER AND BARBARA J. MILLER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Miller v. Commissioner
Docket Nos. 14478-82, 19772-83, 25793-83.
United States Tax Court
T.C. Memo 1986-390; 1986 Tax Ct. Memo LEXIS 220; 52 T.C.M. (CCH) 239; T.C.M. (RIA) 86390; August 20, 1986. Daniel J. Winfree, for petitioners. Karen Nicholson Sommers, for respondent. SHIELDS
*221 MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in and additions to petitioners' income taxes as follows: Additions to Tax
Petitioners
Year
Deficiencies
Section 6653(a) [2]
Stephen A. Miller
1978
$7,196.00
and Barbara J. Miller
1979
14,445.00
Tracy Bischof
1978
6,393.00
$320.00
and Arlyne Bischof
1979
8,116.00
406.00
1980
8,804.00
James A. Palmer
1979
5,830.00
269.00
and Karen T. Palmer
1980
8,732.00
1981
6,218.00
After concessions, the issues remaining for decision are what amounts, if any, are petitioners entitled to deduct for depreciation under section 167 and to claim as credits under section 48(a) because of their investments in certain lithograph plates. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by reference. *222 Petitioners Stephen A. Miller and Barbara J. Miller, husband and wife, resided in Granada Hills, California, at the time they filed their petition. They filed joint income tax returns for the years 1978 and 1979. Stephen was a sales manager for a scientific instrument company and Barbara was a housewife during the years 1978 and 1979. Petitioners Tracy Bischof and Arlyne Bischof, husband and wife, resided in El Cajon, California, when they filed their petition. They filed joint income tax returns for the years 1978, 1979, and 1980. Tracy was a retailer of dental ceramics and Arlyne was a housewife from 1978 through 1981. Petitioners James T. Palmer and Karen A. Palmer, husband and wife, resided in LaMesa, California, at the time they filed their petition. They filed joint income tax returns for the years 1979, 1980, and 1981. James was a junior college instructor and Karen was a teacher during the years 1977 through 1981. Multiple Graphics Enterprises ("Multiple Graphics") was incorporated in California on July 1, 1979, by George W. Petropoulos and David L. Kagel to acquire and resell lithograph plates. Petropoulos and Kagel each owned 50 percent of the stock of Multiple *223 Graphics in 1979 and 1980 and were its principal officers and directors. Neither of them had any experience in the marketing of art prior to their formation of the corporation. They did, however, consult to a limited extent with Herbert Hamrell, the owner of an art gallery. On October 1, 1979, Multiple Graphics entered into an agreement with Herbert Fink, an artist, under which Fink agreed to produce 29 lithograph plates and transfer them together with all related rights to Multiple Graphics. On December 31, 1979, fink transferred the 29 plates and related rights to Multiple Graphics for the sum of $72,500, or $2,500 per plate. During 1979, Multiple Graphics offered to sell undivided one-half interests in each of the 29 plates for a total of $50,000. Each prospective purchaser received an offering memorandum from Multiple Graphics. The memorandum emphasized that the art business was highly speculative and that a purchase of the plates "should be considered only by a person who can afford total loss of his purchase price." Prospective purchasers were also informed by the memorandum that Multiple Graphics had no experience in the art business. Most of the memorandum was addressed *224 to the tax implications of the promotion. The tax implications were also discussed in an opinion letter that accompanied the memorandum. Neither the memorandum nor the opinion letter contained any discussion of the income to be earned from the plates. The only projection concerned the tax savings that could be received by an individual buying a 50 percent interest in one of the plates. This projection appeared in the memorandum in a schedule titled "Projected Results/Purchase of Etching," and purportedly demonstrated how a cash investment of $11,000 by a taxpayer in the 50 percent tax bracket would yield a total tax savings of $29,900. Directly beneath the title of this schedule, projected income was shown as follows: "(Projected Income = $ .0)." Petitioners Miller and Bischof became aware of the promotion through Tax and Business Services, an accounting firm that performed tax services for all petitioners. The accounting firm also represented Multiple Graphics and was involved in the promotion. Petitioner Palmer learned of the promotion from Petropoulos. In November and December of 1979, petitioners Miller, Palmer, and Bischof each purchased a 50 percent interest in a separate *225 plate. Petitioners Miller and Bischof each paid $10,000 cash and executed a $40,000 "recourse" promissory note. Petitioner Palmer paid $6,400 cash and executed a $43,600 "recourse" promissory note. All petitioners agreed to pay Multiple Graphics 50 percent of the gross receipts from any sales of prints from their plates. Such payments were to be applied to the balance due on the notes.Each note was payable in full in 10 years and at maturity could be satisfied, at least partially, by petitioners' tendering to Multiple Graphics any unsold prints. [3]
Petitioners did not have the plates appraised before their purchase and petitioners were not furnished with an appraisal by Multiple Graphics. Petitioners did not discuss the plates with any art experts, but petitioner Palmer did ask an art teacher with whom he worked what she thought about his plate. After the plates were purchased by petitioners, Multiple Graphics had Fink produce 300 prints from each plate. The prints were placed in storage by Multiple Graphics in Los Angeles on May 1, 1980. On June 19, 1980, petitioners *226 met with Multiple Graphics. The purpose of the meeting which was arranged by Multiple Graphics was to introduce petitioners and other purchasers of plates to Graphic Distribution Services ("Graphic Distribution"), a corporation which had been formed two months earlier to market the prints. Hamrell and Kagel were the officers of Graphic Distribution, but Petropoulos was introduced at the meeting as one of its principals. Its address was the same as the address of Multiple Graphics. At the meeting and in follow-up letters, Petropoulos urged petitioners and the other purchasers of plates to appoint Graphic Distribution as the distributor of their prints. All of petitioners did so during July and August of 1980. The distribution agreements provided that Graphic Distribution would market the prints in exchange for 25 percent of the gross receipts plus expenses of up to $250 per year. On May 11, 1981, petitioners received an unsigned "Progress Report" stating that Graphic Distribution was "working diligently to get a sales organization in place and to develop print sales at a level commensurate with the sustainable tax validity of your investment." No sales of prints were made during *227 1981. On November 2, 1981, Philip Miller, the brother of petitioner Stephen Miller, took control of Graphic Distribution by purchasing all of its stock and naming himself its president and his wife vice president and secretary. Neither he nor his wife had any prior experience in marketing prints; and to the date of trial, Graphic Distribution had made few, if any, sales and petitioners had received no income from their investments in the plates and had kept no records with respect thereto. OPINION Petitioners contend that with respect to their lithograph plates they are entitled to deductions for depreciation under section 167 and to investment credits under section 48(a) because the plates were acquired and used by them in a trade or business. Respondent contends that petitioners are not entitled to depreciation deductions or investment tax credits because petitioners' activities did not constitute a trade or business. [4] We agree with respondent. Section 167(a) allows a deduction for depreciation with respect to property used in a trade or business *228 [5] and section 48(a) allows an investment tax credit with respect to certain personal property that qualifies for depreciation under section 167(a). Consequently, in this case both the deductions for depreciation and the investment credits depend upon whether or not petitioners' plates were used in a trade or business. The phrase "trade or business" as used in section 167(a) is to be interpreted in the same manner as the phrase is used in section 162(a). Richmond Television Corp. v. United States,345 F.2d 901, 909 (4th Cir. 1965), remanded on other grounds 382 U.S. 68 (1965); Brannen v. Commissioner,78 T.C. 471, 501 (1982), affd. 722 F.2d 695 (11th Cir. 1984). To constitute the carrying on of a trade or business under section 162, an activity must "be entered into, *229 in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. See also Hager v. Commissioner,76 T.C. 759, 784 (1981), and the cases cited therein. The expectation of a profit need not be a reasonable one. It is sufficient if there is a bona fide objective of making a profit. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner,Kratsa v. Commissioner,Leffel v. Commissioner,Rosenblatt v. Commissioner,Zemel v. Commissioner,734 F.2d 5-7, 9 (3d Cir. 1984); Hager v. Commissioner,supra.Whether there is an intention to make a profit is one of the facts to be resolved from all the surrounding circumstances. Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981); *230 Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). The burden of proof with respect to the requisite intention is on petitioners. Rule 142(a); Golanty v. Commissioner,supra at 426. In making the determination as to intent, objective facts are to be given greater weight than the parties' statements of their intent. Fox v. Commissioner,supra at 1007. In Golanty v. Commissioner,supra, we set forth a list of factors that have been considered relevant in previous cases to a determination of whether an activity was entered into for profit. We find that the following factors from that list are relevant to the cases before us: (1) The manner in which the activity was conducted; (2) the expertise of the taxpayers or their advisors; (3) the time and effort expended by the taxpayers in carrying on the activity; (4) the expectation that the assets would appreciate in value; (5) the taxpayers' history of income or losses with respect to the activity; and (6) the amount of profits, if any, which were earned. The first, and perhaps most important, factor to be considered *231 in these cases is the manner in which the activity was conducted. The record as a whole reveals that petitioners in each case acted in a nonbusinesslike manner and were not concerned with making a profit. To begin with, they purchased the plates without having any idea of their worth and without attempting to obtain appraisals. At the time of purchase, petitioners did not know what price, if any, the prints would sell for, how long it would take to sell the prints, what state the art market was in, or how the artist's work was regarded. The only projection that petitioners had was a schedule of anticipated tax savings, and this schedule, provided by the promoter, assumed that the income from the prints would be zero. The offering memorandum was devoted almost entirely to the tax implications of the promotion and contained no discussion of possible profits. In sum, from the offering and at the time the plates were purchased, petitioners knew only one thing, i.e., if the statements made in the offering were correct, the plates would result in large tax savings to petitioners. Petitioners and their co-owners also agreed to pay $100,000 for plates that Multiple Graphics had just *232 paid $2,500. Their purchase price represented an incredible 4000 percent increase over Multiple Graphics' cost. Petitioners' actions after the plates were purchased further reflect their indifference to a profit. At the urging of Multiple Graphics, petitioners chose to market their prints through Graphic Distributions -- a corporation that had been in existence for only two months and had two of the same principals as Multiple Graphics. Petitioners were also aware that these two principals, Petropoulos and Kagel, had no experience in the art world. After more than a year without any sales, the other principal, Hamrell, who had limited art experience, was replaced by the brother of petitioner Stephen Miller, but the brother was "starting a new career" and this change added nothing to the prospects for petitioners' investments. With respect to the other factors listed in Golanty v. Commissioner,supra, the record clearly reflects the following: (1) petitioners expended little effort in marketing their prints; (2) there was no supportable expectation by petitioners that their prints or plates would ever appreciate in value; and (3) their investments yielded *233 no gross income during the four years in issue. In fact, the record fails to reveal the sale of even one print prior to trial. We conclude, therefore, that petitioners' activities with respect to their plates were engaged in solely for the purpose of reducing their income taxes and were not engaged in for profit and did not constitute a trade or business. See Knetsch v. United States,364 U.S. 361 (1969). Consequently, petitioners are not entitled to depreciation deductions or investment credits with respect to the plates.[6]
Decision will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Tracy Bischof and Arlyne Bischof, docket No. 19772-83; and James A. Palmer and Karen T. Palmer, docket No. 25793-83.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
3. Petitioners were to be given credit for 50 percent of the retail selling price of the unsold prints.↩
4. Respondent advanced other arguments, but we find it unnecessary to address them in light of our decision on this issue.↩
5. Section 183 allows depreciation deductions and investment credits with respect to certain property used in an activity which does not constitute a trade or business but only to the extent the activity generates income. In this case it is admitted that there was no income from the activity; therefore, petitioners must rely only on section 167(a).↩
6. Even if petitioners' activities qualified as a trade or business, petitioners have not established that their plates have determinable useful lives, another prerequisite for depreciation deductions under section 167(a). Section 1.167(a)-1(a) and (b), Income Tax Regs.; Wolfsen Land & Cattle Co. v. Commissioner,72 T.C. 1, 12↩ (1979).